NOT FOR PUBLICATION

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In the matter of | : | Case No. 05-42736/JHW |
| GB Holdings, Inc. | : | |
| | | **OPINION ON RETENTION** |
| Debtor. | : | **APPLICATIONS** |

_____

APPEARANCES:     Peter D. Wolfson, Esq.
Andrew P. Lederman, Esq.
Arthur H. Ruegger, Esq.
Sonnenschein Nath & Rosenthal LLP
1221 Avenue of the Americas
New York, New York 10020
Counsel for Debtor, GB Holdings, Inc.

```
┌─────────────────────────────────┐
│            FILED                │
│    JAMES J. WALDRON, CLERK      │
│          12/16/05               │
│   U.S. BANKRUPTCY COURT         │
│        CAMDEN, N.J.             │
│   BY: s/ M. Boyer  DEPUTY       │
└─────────────────────────────────┘
```

Joel A. Yunis, Esq.
Katten Muchin Rosenman LLP
575 Madison Avenue
New York, New York  10022-2585
Special Corporate Counsel for Debtor GB Holdings, Inc.

David S. Rosner, Esq.
Andrew K. Glenn, Esq.
Scott Bernstein, Esq.
Craig S. Hueneke, Esq.
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, NY 10019-6799
Counsel for the Official Committee of Unsecured Creditors,

Charles A. Stanziale, Jr., Esq.
Jeffrey T. Testa, Esq.
McElroy, Deutsch, Mulvaney & Carpenter, LLP
Three Gateway Center
100 Mulberry Street
Newark, New Jersey  07102-4079
Co-counsel for the Official Committee of Unsecured Creditors

Frank A. Merola, Esq.
Nathan A. Schultz, Esq.
Stutman, Treister & Glatt P.C.
1901 Avenue of the Stars, 12th Floor
Los Angeles, California   90067
Counsel for Harbert Distressed Investment Master Fund, Ltd.

Nicole M. Nigrelli, Esq.
Jeffrey Kurtzman, Esq.
Klehr, Harrison, Harvey, Branzburg & Ellers LLP,
457 Haddonfield Road, Suite 510
Cherry Hill, New Jersey  08002
Co-counsel for Harbert Distressed Investment Master Fund, Ltd.

Stephen M. Yoder, Esq.
Neil B. Glassman, Esq.
The Bayard Firm
222 Delaware Avenue, P.O. Box 25130
Wilmington, Delaware 19899
Counsel for Robino Stortini Holdings, LLC,

Edward S. Weisfelner, Esq.
Brown Rudnick Berlack & Israels, LLP
Seven Times Square
New York, New York  10036
Counsel for Carl C. Icahn & Affiliates

Steven B. Levine, Esq.
Brown Rudnick Berlack & Israels, LLP
One Financial Center
Boston, Massachusetts  02111
Counsel for Carl C. Icahn & Affiliates

Eric A. Browndorf, Esq.
Cooper Levenson April Niedelman &  Wagenheim, P.A.,
1125 Atlantic Avenue
Atlantic City, New Jersey  08401
Co-counsel for Carl C. Icahn & Affiliates

Steven Wilamowsky, Esq.
Willkie, Farr & Gallagher, L.L.P.
The Equitable Center, 787 Seventh Avenue
New York, New York  10019-6099
Counsel for D.E. Shaw Laminar Portfolios, L.L.C.

Anthony Sodono, Esq.
Assistant United States Trustee
Office of the United States Trustee
One Newark Center, Suite 2100
Newark, New Jersey   07102
Counsel for the United States Trustee


The debtor-in-possession, GB Holdings, Inc., presents applications to employ the following parties for post-petition legal and/or other professional services:  (1) the firm of Sonnenschein Nath & Rosenthal LLP ("Sonnenschein") to serve as the debtor's general reorganization and bankruptcy counsel; (2) Libra Securities, LLC ("Libra"), a financial advisor and investment banking firm, to serve as the debtor's financial advisor; and (3) the firm of Katten Muchin Rosenman LLP ("Katten") to act as the debtor's special corporate counsel.  Each of the applications has been objected to by the United States Trustee ("UST"), the Official Unsecured Creditors' Committee (the "Committee") and its predecessor-in-interest, the Ad Hoc Committee of GB Holdings, Inc. Bondholders ("Ad Hoc Committee"), and the creditor Harbert Distressed Investment Master Fund, Ltd.  ("Harbert") (collectively, the "Objectors").


Each of the three retention applications are denied herein.  Sonnenschein's retention is denied under 11 U.S.C. § 327(a) because the firm represents an interest adverse to the debtor's estate.  Libra's retenion is denied because the firm is not a disinterested person under 11 U.S.C. § 101(14).  Katten's retention is denied under 11 U.S.C. § 327(e) because the firm holds an interest adverse to the estate with respect to the matters on which the firm is to be employed.

Below, I will first outline the background leading up to the debtor's Chapter 11 filing. I will then address the legal framework for the retention of professionals by a debtor-in-possession under the Bankruptcy Code, followed by a discussion of each of the retention applications at issue here.

## FACTS AND PROCEDURAL HISTORY

I.    Debtor's Prior Bankruptcy Filing

The debtor, a Delaware corporation, first filed a petition for relief under Chapter 11 of the Bankruptcy Code on January 5, 1998 in case number 98-10002/JHW.  By order dated August 14, 2000, this court confirmed the debtor's Modified Fifth Amended Joint Plan of Reorganization ("2000 Plan").  See In re Greate Bay Hotel & Casino, Inc., 251 B.R. 213 (Bankr. D.N.J. 2000).

The main proponents of the 2000 Plan were companies either controlled by, or otherwise affiliated with, investor Carl C. Icahn (collectively referred to herein as "Icahn Affiliates").[1] Id. at

---

[1]    Icahn Affiliate, High River L.P., presented the 2000 Plan "on behalf of the Cyprus L.L.C. ["Cyprus"] and the Larch L.L.C., [then] recently formed [Delaware LLCs which the Court] referred to collectively as 'High River'.  Cyprus is owned by the Starfire Holding Corporation and the Barberry Corporation, each of which is wholly owned by Carl C. Icahn. Larch is also wholly owned by Mr. Icahn." In re Greate Bay Hotel, 251 B.R. at 222.  References to "Icahn Affiliates" in this opinion include any companies owned and/or controlled by Carl C. Icahn.

4

222-23.  Prior to confirmation of the 2000 Plan, certain Icahn Affiliates collectively held

approximately one-third of the 10-⅞ First Mortgage Notes issued in 1993 by the debtor's then co-

debtor and wholly-owned subsidiary, GB Property Funding Corporation ("GB Funding").  GB

Funding provided funding to a second then-wholly-owned subsidiary of the debtor, Greate Bay

Hotel and Casino, Inc. ("GBHC").  GBHC, a New Jersey corporation, operated the Sands Hotel

and Casino ("Sands") in Atlantic City.  Id. at 218-19.


Under the 2000 Plan, the Icahn Affiliates funded about $60 million in new capital,

acquiring thereby nearly half of the new shares of common stock issued by the reorganized debtor.

The plan was further funded by the issuance of $110 million in new 11% Notes (the "Notes") by

GB Funding, with a maturity date of September 29, 2005.  The debtor and GBHC were guarantors

on the Notes, and Wells Fargo Bank Minnesota, N.A. ("Wells Fargo" or "Trustee") was the

Indenture Trustee.  The Notes were collateralized by the assets of GBHC, i.e., the Sands.


On September 29, 2000, the effective date of the 2000 Plan, holders of the 1993 Notes

received both a pro rata distribution of shares in debtor's new stock and the new Notes.

Following the effective date, the Icahn Affiliates controlled a majority of the stock issued by the

reorganized debtor.

II.    The "Exchange Offer" and "Exchange Transaction"

During the summer of 2003, the debtor announced its intention to refinance the Notes on more favorable terms, issuing a Consent Solicitation and Offer to Exchange (the "Exchange Offer", or, as consummated, the "Exchange Transaction").  Libra, the investment firm that the debtor seeks to employ herein, was retained in April 2003 by an Independent Committee of the debtor's Board of Directors to provide a fairness opinion as to the proposed transaction and a Trust Indenture Act ("TIA") Certificate to be delivered to Wells Fargo.  Libra concluded, in its fairness opinion dated July 14, 2003, that the proposed Exchange Transaction was fair "from a financial point of view" to the debtor's common stockholders.[2]  As to the TIA Certificate, Libra opined that the "release of all of the collateral from the lien of the security documents . . . will not impair the security under the Indenture in contravention of the provisions thereof."[3]

The Exchange Offer and Transaction provided for the merger of GB Funding and GBHC into the debtor, and for the transfer of all their assets, but only some of their liabilities, to two new subsidiary entities.  The first of these new entities, Atlantic Coast Entertainment Holdings, Inc. ("ACEH"), a Delaware corporation, would issue 3% bonds payable in 2008 ("ACEH Notes") in exchange for the Notes.  In exchange for the transfer of the assets of GB Funding and GBHC, the debtor would receive, on a fully-diluted basis, approximately 28% of the stock to be issued by

[2]    Andrew K. Glenn Decl. in Supp. of Committee's Obj. to Debtor's Apps., Exh. B at 3.

[3]    Gregory Bousquette Suppl. Affid. in Support of Libra's Retention at 3, ¶ 6.

6

ACEH.  At any time, the holders of a majority of the aggregate principal amount of the outstanding ACEH Notes could, in their sole discretion, choose to convert the ACEH Notes into ACEH stock.   ACEH would be the parent corporation to the second new entity, ACE Gaming LLC ("ACE").   ACE, a New Jersey limited liability company, would receive substantially all of the assets constituting the Sands, would operate the casino, and would acquire and hold the requisite licenses.  Mr. Icahn would become the Chairman of the Board for both ACEH and ACE.

At the time that the special stockholders' meeting to vote upon the proposed Exchange Transaction took place, on or about June 30, 2004, the Icahn Affiliates controlled about 77% of the debtor's shares of stock, and held 58% of the aggregate principal amount of the Notes.  The shareholders and bondholders approved the Exchange Transaction, and the transaction was consummated by the end of July 2004.  The majority of the bondholders, predominantly Icahn Affiliates, traded in about $66.3 million of their Notes in exchange for ACEH Notes.  The bondholders who agreed to the exchange assented to the elimination of certain covenants from the Indenture and to the release of the liens on the collateral securing the Notes.  Following the release of the liens, the Sands was transferred to ACE, and the holders of the ACEH Notes received a first lien security interest on the assets.  The holders of approximately $43.7 million of the Notes did not accept the Exchange Offer, and the debtor became the primary obligor on the unexchanged Notes.  The holders of the unexchanged Notes comprise most of the unsecured creditors of the debtor's current bankruptcy estate.

III.    Icahn Affiliates Exercise Warrants

On or about May 17, 2005, American Real Estate Holdings ("AREH"), an Icahn Affiliate, as the majority holder of the ACEH Notes, exercised its option to convert its ACEH Notes into ACEH stock.  At this point, certain warrants to purchase ACEH stock, distributed to the debtor's stockholders as part of the Exchange Transaction, became exercisable.  As a stockholder of the debtor, AREH exercised its warrants to purchase ACEH stock.  By combining the stock received in exchange for the ACEH Notes, and the stock received in exercising its warrants as a stockholder of the debtor, AREH became the majority shareholder of ACEH, holding 58.3% of its outstanding stock.

The net result of the Exchange Transaction and subsequent exercise of various rights arising under the transaction was that the debtor became a minority shareholder in ACEH, owning approximately 41.7% of the outstanding ACEH stock, or about 28.8% of the ACEH stock on a fully diluted basis.  In March 2005, ACEH and ACE agreed to provide the debtor funds, not to exceed $250,000 in any twelve month period, for expenses, and to pay the interest due on the remaining Notes, but this commitment expired on the maturity date of the Notes, September 29, 2005.  Prior to the filing of the bankruptcy petition, the debtor de-listed and de-registered both the 11% Notes and GB Holdings common stock from the American Stock Exchange.

IV.      Debtor's Efforts to Sell its ACEH Stock and its Bankruptcy


During the Spring of 2005, the debtor's Board of Directors, acting through an Independent

Committee, undertook a program to attempt to sell its ACEH stock and to pay off the Notes.  The

debtor engaged Libra again, "to assist and advise the Independent Committee with respect to

various alternatives to pay or satisfy or otherwise refinance the outstanding" Notes.[4]  To secure the

funds to retain Libra and to pay other operating expenses, the debtor entered into a Loan and

Security Agreement dated July 25, 2005, with AREH, whereby AREH provided the debtor with a

revolving credit facility, making available up to $2.5 million in advances and letters of credit.  The

debtor granted AREH a first lien security interest on its assets, including 250,000 shares of the

debtor's ACEH stock.[5]  Pursuant to the Loan Agreement, AREH arranged for the issuance of a

$675,000 letter of credit for the debtor's account and for the benefit of Libra, as required by Libra

as a condition of its engagement.  As of the date of the filing of the petition, the unpaid principal

balance of loans under the Loan Agreement was approximately $1.2 million, plus $675,000 in the

Libra letter of credit that was not drawn upon.


Since then, Libra has marketed the debtor's ACEH stock, but was unable to find a willing

buyer for the stock before the Notes became due.   The debtor voluntarily filed for Chapter 11

protection on the day that the Notes matured, September 29, 2005.  On the same date, the debtor

---

[4]      Denise Barton Decl. in Support of First Day Orders at 10, ¶24.

[5]      Andrew K. Glenn Decl., _supra_, Exh. C (Loan Agreement) at 3 § 1.2, 12 § 3.1.

filed a motion to approve an auction bidding process for a section 363 sale of the debtor's ACEH

interests ("Sales Motion").  The Sales Motion is opposed by the Committee and by the debtor's

minority shareholders.


On November 10, 2005, oral argument was presented on both the Sales Motion and the

retention applications for the three professionals at issue here.  The Committee's application to

adjourn the Sales Motion was granted, and the retention applications were taken under

advisement.[6]


## **DISCUSSION**


The trustee of a bankruptcy estate may, subject to the court's approval, employ "one or more

attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or

represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the

trustee in carrying out the trustee's duties" under the Code.  11 U.S.C. § 327(a).  In Chapter 11, the

standards applicable to the retention of counsel or other professionals by the trustee also apply to the

retention of such professionals by a debtor in possession.  See 11 U.S.C. § 1107(a) ("[A] debtor in

possession shall have all the rights, other than the right to compensation under section 330 of this

title, and powers, and shall perform all the functions and duties, except the duties specified in

sections 1106(a)(2), (3), and (4) of this title, of a trustee serving in a case under this chapter.").

---

[6]        The Committee's motion to seal exhibits is resolved by a separate opinion.

The purpose of section 327 is "to ensure impartiality in bankruptcy representation."  In re

Prince, 40 F.3d 356, 360 (11th Cir. 1994).  By requiring no adverse interest and disinterestedness,

section 327 "'serve[s] the important policy of ensuring that all professionals appointed pursuant to

section 327(a) tender undivided loyalty and provide untainted advice and assistance in furtherance of

their fiduciary responsibilities.'"  In re Crivello, 134 F.3d 831, 836 (7th Cir. 1998) (quoting Rome v.

Braunstein, 19 F.3d 54, 58 (1st Cir. 1994)).  A professional retained pursuant to section 327(a)

"assumes a fiduciary responsibility to refrain from rendering any unauthorized service in furtherance

of an interest adverse to the client he [or she] serves by court appointment."  19 F.3d at 62.


Under section 327(a), the applicant must satisfy a two-part test for retention.  The

professional "'must "not hold or represent an interest adverse to the estate" and must be a

"disinterested person."'"  In re BH&P, Inc., 949 F.2d 1300, 1314 (3d Cir. 1991) (quoting In re Star

Broad., Inc., 81 B.R. 835, 838 (Bankr. D.N.J. 1988)).  As to the first requirement, an interest may be

considered adverse to the estate when the professional holds or represents "'a competing economic

interest tending to diminish estate values or to create a potential or actual dispute in which the estate

is a rival claimant.'"  In re First Jersey Sec., Inc., 180 F.3d 504, 509 (3d Cir. 1999) (quoting In re

Caldor, Inc. NY, 193 B.R. 165, 171 (Bankr. S.D.N.Y 1996)).  See also In re Marvel Enter. Group,

Inc., 140 F.3d 463, 476 (3d Cir. 1998) (outlining standards for adverse interests).  "To 'represent an

adverse interest' means to serve as agent or attorney for any individual or entity holding such an

adverse interest."  In re Envirodyne Indus., Inc 150 B.R. 1008, 1017 (Bankr. N.D. Ill. 1993).  "In

summary, § 327(a) mandates disqualification when there is an actual conflict of interest, allows for it

when there is a potential conflict, and precludes it based solely on an appearance of conflict."  In re

11

First Jersey Sec., 180 F.3d at 509.


As to the second requirement, the term "disinterested person" is defined under the Code in

relevant part as a person who:

    (A)    is not a creditor, an equity security holder, or an insider;


    (B)    is not and was not an investment banker for any outstanding security of the
        debtor;


    (C)    has not been, within three years before the date of the filing of the petition, an
        investment banker for a security of the debtor, or an attorney for such an
        investment banker in connection with the offer, sale, or issuance of a security
        of the debtor;


    (D)    is not and was not, within two years before the date of the filing of the
        petition, a director, officer, or employee of the debtor or of an investment
        banker specified in subparagraph (B) or (C) of this paragraph; and


    (E)    does not have an interest materially adverse to the interest of the estate or of
        any class of creditors or equity security holders, by reason of any direct or
        indirect relationship to, connection with, or interest in, the debtor or an
        investment banker specified in subparagraph (B) or (C) of this paragraph, or
        for any other reason.


11 U.S.C. § 101(14) (2004).[7]

---

[7]    Section 101(14)'s definition of a "disinterested person" was amended, effective
October 17, 2005, to remove references to "investment bankers," i.e., subsections (B) and (C).
See Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.  (Pub L. No. 109-08,
119 Stat. 23). Because this case was filed before the effective date of the new Act, the statute as
it existed prior to the amendments will be applied.

"There is, indisputably, some overlap between the section 327(a) standard and [the] section

101(14)(E) disinterest requirement." BH&P, 949 F.2d at 1314.  That is, a professional that "fails the

disinterested test on the ground that it 'has' an interest adverse to the estate automatically fails the

first prong of the test because, by definition, it also 'holds' such an interest.  Have and hold are

synonymous." In re AroChem Corp., 176 F.3d 610, 629 (2d Cir. 1999).  Where the two prongs of

section 327(a) differ is that the section 101(14)(E) disinterestedness requirement "may be read to

implicate only the personal interests of the trustee [or the appointed counsel or professional]",

BH&P, 949 F.2d at 1310, whereas the requirement that the professional may not hold or represent an

interest adverse to the estate extends beyond personal interests to include the representation of

adverse interests.  As the Third Circuit observed, "[w]here section 327 explicitly applies to persons

who hold or represent adverse interests, disqualifying both, section 101(14)(E) refers only to those

who have disqualifying interests.  We do not think that this difference in terminology was

accidental." Id. at 1310 n.12 (emphasis in original).  See also AroChem, 176 F.3d at 629.


Other critical statutory provisions implicated on the retention issues presented here include

section 327(c), section 327(e) and section 1107(b).  Section 327(c) mandates disapproval of

employment by a trustee or debtor-in-possession where the applicant has been employed by or

represented a creditor, where another creditor or the UST objects, and where there is an actual

conflict.[8]  Section 327(e) allows the trustee or debtor-in-possession to employ, for a specified special

---

[8]        Section 327(c) states:

In a case under chapter 7, 12, or 11 of this title, a person is not disqualified for
employment under this section solely because of such person's employment by or

13

purpose, "an attorney that has represented the debtor, if in the best interest of the estate, and if such

attorney does not represent or hold any interest adverse to the debtor or to the estate with respect to

the matter on which such attorney is to be employed."  11 U.S.C. § 327(e).  And under section

1107(b), "a person is not disqualified for employment under section 327 of this title by a debtor in

possession solely because of such person's employment by or representation of the debtor before the

commencement of the case."  11 U.S.C. § 1107(b).


I.      Sonnenschein Retention Application


The debtor seeks to employ Sonnenschein as general bankruptcy counsel.[9] Sonnenschein

reports that it has represented Triage Capital Mgmt. ("Triage"), one of the debtor's bondholders, and

Wells Fargo, the Indenture Trustee, and its affiliates, in matters unrelated to the debtor.

Sonnenschein presently continues to represent Wells Fargo in unrelated matters.  Sonnenschein has

also represented various Icahn Affiliates, as follows:

------

representation of a creditor, unless there is objection by another creditor or the
United States trustee, in which case the court shall disapprove such employment if
there is an actual conflict of interest.

11 U.S.C. § 327(c).

[9]   The U.S. Trustee initially objected to the debtor's proposed retention of Sonnenschein
on the ground that it needed more information concerning: (a) the ultimate source of the
$350,000 retainer received by that firm for assisting the debtor in preparing its Chapter 11
petition and performing subsequent legal work in this bankruptcy case; and (b) Sonnenschein's
representations of the Icahn Affiliates and Wells Fargo.  See UST Obj. to Sonnenschein Ret.
Appl. at 3-5, ¶¶ 7-12.  The UST's objection has been resolved.

14

a.    Phillip Services Corporation

Sonnenschein represented Phillip Services Corporation and its affiliated debtors, in connection with their Chapter 11 proceeding in the Southern District of Texas.  Icahn Affiliate High River, L.P.,  a creditor and plan sponsor,[10] was represented by the Brown Rudnick firm.  The plan was confirmed in December 2003.  The case is largely concluded.  Sonnenschein periodically receives and responds to calls from creditors or the company about the Chapter 11 proceedings.

b.    Icahn Affiliates High River, L.P., and Thornwood Associates, L.P.

Sonnenschein represented Icahn Affiliates High River, L.P., and Thornwood Associates L.P. with the TransTexas Gas Corporation Chapter 11 bankruptcy proceeding in the Southern District of Texas.  A plan was confirmed in August 2003.  Since confirmation Sonnenschein has provided sporadic, nominal services of a follow up nature for both High River and Thornwood, largely consisting of responding to creditor inquiries and discovery requests in connection with a suit brought by a litigation trustee against unrelated third parties.  High River and Thornwood are not parties to that action, and Sonnenschein does not represent any parties to that action..[11]

c.    Icahn Affiliate Aretex and Icahn-Affiliated Successors to WestPoint Stevens

Sonnenschein previously represented Icahn Affiliate Aretex LLC ("Aretex") and a non-Icahn Affiliate, Franklin Mutual Advisors LLC in connection with the Chapter 11 proceeding of Union Power L.P. that was pending in the District of Arizona.  This proceeding has concluded.[12]

Sonnenschein currently represents Aretex in another Chapter 11 proceeding, WestPoint Stevens, Inc., in the Southern District of New York.  In that case, Sonnenschein also represents WestPoint International, Inc. and WestPoint Home, Inc. (collectively, "WestPoint"), the entities created in connection with the purchase of

---

[10]    Peter D. Wolfson Decl. in Support of Sonnenschein Ret. Appl. at 6, ¶ 14(d) (9/29/05).

[11]    Wolfson Suppl. Decl. at 2, ¶ 5 (10/28/05).

[12]    Wolfson Decl. at 6, ¶ 14(b) (9/29/05).

assets from WestPoint Stevens.  Sonnenschein currently represents Aretex and
WestPoint in connection with an appeal of the order approving the Section 363 sale
("WestPoint Sales Order") of those assets.  At the time of the November 10, 2005,
hearing, the debtors' motion to dismiss the WestPoint case was pending, and a
decision on the district court appeal was expected shortly.

Following the submission of Sonnenschein's Second Supplemental Declaration dated
November 11, 2005, no further submissions were made by the firm.  From the public
docket of the Southern District of New York, it appears that on November 14, 2005,
Sonnenschein filed a motion, returnable on November 30, 2005, on behalf of Aretex
and WestPoint, to enforce the WestPoint Sales Order.  (See Dkt. No. 1308, Bankr.
S.D.N.Y. No. 03-13532-RDD.)  On November 16, 2005, the District Court for the
Southern District of New York issued an opinion reversing and remanding that
portion of the WestPoint Sales Order allowing the debtors and WestPoint to make an
"in-kind" distribution of shares to the debtors' first tier secured creditors.  See In re
WestPoint Stevens, Inc., 333 B.R. 30 (S.D.N.Y. 2005).  On December 5, 2005,
Sonnenschein, as counsel for Aretex and WestPoint, requested the bankruptcy judge
to defer any scheduling conference for the remand because of two pending matters
before the District Court, i.e., the winning appellants' motion for clarification of the
November 16, 2005 opinion, and Sonnenschein's Motion to Certify Issues for
Immediate Appeal Pursuant to [28 U.S.C. §] 1292(b). (See Dkt. No. 1322, Bankr.
S.D.N.Y. No. 03-13532-RDD.) .

d.      Icahn Affiliate XO Communications, Inc.

Sonnenschein provides public policy counsel and advocacy services to Icahn Affiliate
XO Communications, Inc., before Congress and the Executive Branch in connection
with pending telecommunications legislation and regulatory initiatives.[13]

On this record, I conclude that the Sonnenschein firm does not personally "hold" an adverse

interest to the debtor under section 327(a).  As in AroChem, the Committee has "not produced any

evidence to indicate that [Sonnenschein] personally 'holds' any interests adverse to the [debtor].  It is

not a pre-petition creditor of the [debtor], nor does it otherwise personally possess any claims or

---

[13]      Wolfson Second Suppl. Decl. at 2, ¶ 7 (11/11/05).

interests contrary to the [debtor]."  AroChem, 176 F.3d at 623.  Sonnenschein is "disinterested"

under section 101(14)(E) for the same reason.  The Committee has not shown that Sonnenschein

personally "has" a materially adverse interest to the debtor, its equity security holders, or its

creditors.  See In re Huntco, Inc., 288 B.R. 229, 233 (Bankr. E.D. Mo. 2002) (following AroChem

and BH&P in holding that "a law firm is not disinterested under §101(14)(E) simply because it

represents an entity that may be a non-disinterested person.  Rather, a law firm is disinterested under

§101(14)(E) unless it personally holds a materially adverse interest to the estate, creditor or equity

holders.").


However, by its continuing representation of Icahn affiliated entities, Sonnerschein does

represent adverse interests, warranting disqualification under section 327(a).[14]  Sonnenschein

contends that its prior and concurrent representation of certain Icahn Affiliates in unrelated matters,

that are not directly involved in this matter, comprises a de minimus conflict of interest amounting

to, at most, a mere permissible "appearance of impropriety" under the Marvel standard.

Sonnenschein maintains that these representations are not "very large, and in the aggregate, these

matters represent approximately 1% of Sonnenschein's annual revenue."[15]  The firm contends that

the prospect of litigation against the Icahn Affiliates associated with the debtor is speculative.

Moreover, if such litigation ensues, the Committee would most likely represent the estate, thereby

---

[14]     The objectors do not contend that either the past representation by Sonnerschein
of Triage, or the continuing representation by Sonnerschein of Wells Fargo in unrelated matters,
constitute the representation of adverse interests under section 327(a).

[15]     Wolfson Decl. at 7, ¶ 17.

avoiding any conflict on the part of Sonnenschein.  According to Sonnenschein, the dispute with the

objectors is not about conflict of interest, but about a strategic difference in how the case should

proceed.

The Third Circuit has defined "adverse interest" as "'a competing economic interest tending

to diminish estate values or to create a potential or actual dispute in which the estate is a rival

claimant.'"  First Jersey, 180 F.3d at 509 (quoting In re Caldor, Inc. NY, 193 B.R. 165, 171 (Bankr.

S.D.N.Y. 1996)).  Here, there is no question that the Icahn Affiliates associated with the debtor,

including AREH, the debtor's majority shareholder, and Carl Icahn himself, who serves as Chairman

of the Board of the debtor, and Chairman of the Board of both ACEH and ACE, the companies who

now own and operate the Sands, hold adverse interests to the estate.  Sonnenschein is correct that

affiliated entities often have aligned interests, see In re Huntco, Inc., 288 B.R. 229, 234-35 (Bankr.

E.D. Mo. 2002), and that AREH is not necessarily adverse to the debtor merely because it is its

dominant shareholder.  As the Huntco court stated, "the proper application of § 327(a) must give the

bankruptcy court the flexibility to analyze the economic realities underlying the relationship between

the shareholders and the debtor in possession."  Id.

The "economic realities" of the debtor's constituencies, including the Icahn Affiliates on the

one hand, and the bondholders on the other, are significantly adverse to each other.  The economic

interests of the Icahn Affiliates are aligned with a prompt sale of the debtor's shares of ACEH stock,

a prompt satisfaction of the secured debt due to AREH, a distribution of the remaining proceeds to

18

the bondholders, and a windup of the affairs of the debtor, leaving the business affairs of ACEH and

ACE undisturbed and able to pursue the business of the Sands with reduced debt and improved

financial prospects.  In contrast, the economic interests of the debtor, represented by its primary

economic stakeholders, the bondholders, include the prospect of litigation to seek redress for the

alleged diminution in the value of the debtor's assets occasioned by the Exchange Transaction.  Such

litigation contemplates the naming of Icahn Affiliates, including AREH and Carl Icahn, as

defendants, and the avoidance of the transfers of property from the debtor and its former subsidiaries

to ACEH and ACE.

It is clear that the Icahn Affiliates associated with the debtor hold an adverse interest to the

debtor's estate.  We must now determine whether Sonnenschein represents those adverse interests

and would thus be disqualified from employment by the debtor-in-possession.

It is uncontested that Sonnenschein does not now, and has not in the past, represented AREH,

ACEH, ACE, Carl Icahn, or any other named entity associated with the debtor.  Sonnenschein has

represented, however, and continues to represent, other Icahn-affiliated companies, including High

River L.P., Aretex, WestPoint and XO.

To determine whether such representation constitutes grounds for section 327(a)

disqualification, we must examine, to the extent that this record, and the public record, will allow,

the connections between the Icahn Affiliates connected with the debtor[16], and the Icahn Affiliates

represented by Sonnenschein in unrelated matters.[17]  The central figure in both groups is Carl Icahn

himself.  As noted, Mr. Icahn is chairman of the Board of both the debtor and ACEH, the new entity

which now owns and operates the Sands through ACE.  AREH is the majority owner of both the

debtor and ACEH.  The connection between Carl Icahn, his affiliates represented by Sonnenschein,

and AREH is best explained by the Icahn Affiliates themselves, in the "Prospectus" for an Exchange

of Notes set forth in the Amendment No. 1 to Form S-4 filed with the SEC on December 2, 2005, by

AREH's majority owner, American Real Estate Partners, L.P. ("AREP"):

> American Real Estate Partners, L.P. is a diversified holding company engaged
> in a variety of businesses. Our primary business strategy is to continue to grow our
> core businesses, including home fashion, gaming, oil and gas exploration and
> production and real estate.  In addition, we seek to acquire undervalued assets and
> companies that are distressed or in out of favor industries.  We may also seek
> opportunities in other sectors, including energy, industrial manufacturing and
> insurance and asset management.

> Our general partner is American Property Investors, Inc., a Delaware corporation,
> which is a wholly owned subsidiary of Beckton Corp., a Delaware corporation.  All of
> the outstanding capital stock of Beckton Corp. is owned by Carl C. Icahn.
> Substantially all of our businesses are conducted and our assets held through a

---

[16]    In the debtor's Section 13D filing with the Securities and Exchange Commission
(SEC) dated May 17, 2005, the nine corporate and individual signatories include Carl C. Icahn
individually, and at least two entities wholly owned by Icahn, including Cyprus LLC ("Cyprus")
and Starfire Holding Corporation ("Starfire").  Cyprus is owned by Starfire and the Barberry
Corporation ("Barberry") each of which is wholly-owned by Carl Icahn.  See note1, supra.  The
Section 13D filing of ACEH on the same date, May 17, 2005, has the identical nine corporate
and individual signatories.

[17]    Sonnenschein's previous representation of unrelated Icahn Affiliates in closed and
unrelated matters does not pose a problem to its present retention by the debtor.  Section 327(a)
only bars the retention of professionals who presently hold or represent interests adverse to the
estate.  See AroChem, 176 F.3d at 623.  Thus, Sonnenschein's past representations do not serve
to disqualify the firm.

20

subsidiary limited partnership, American Real Estate Holdings Limited Partnership, or AREH, in which we own a 99% limited partnership interest.  API also acts as the general partner for AREH.  API has a 1% general partnership interest in each of us and AREH.  As of November 1, 2005, affiliates of Mr. Icahn owned 9,346,044 preferred units and 55,655,382 depositary units, which represent 86.5% and 90.0% of the outstanding preferred units and depositary units, respectively.[18]

The Prospectus charts the structure of the Icahn organization as follows:



---

[18]        AREP Amend. No. 1 to Form S-4 at 1 filed with the SEC on 12/2/05.

As the saying goes, a picture is worth a thousand words.  The story this picture tells is that the

debtor, ACEH and WestPoint are all part of the same enterprise headed by Carl Icahn through AREP

and AREH.  The representation of West Point by Sonnenschein is current and ongoing.  As well,

although XO, which Sonnenschein also represents concurrently, does not appear on the chart, its part

in the Icahn enterprise is demonstrated in recent Section 13D SEC filings, in which Carl Icahn and

Starfire Holding Corporation, a wholly-owned Icahn company, are signatories, as they are for the

debtor and for ACEH.[19]  The same attorney, Keith Schaitkin, Esquire, for the "Icahn Associates

Corp.", is the "Person Authorized to Receive Notices and Communications" on the Schedules 13D

forms of XO, ACEH and the debtor.  There is sufficient commonality in ownership and/or control

among the various entities to support the conclusion that continued representation by Sonnenschein

of WestPoint and XO constitutes the representation of an adverse interest of the debtor.


The SEC and court filings quoted at length above are not part of the formal record before the

court.  Federal Rules of Evidence ("F.R.E.") allow the court to take judicial notice of such

documents, stating in relevant part: "A judicially noticed fact must be one not subject to reasonable

dispute in that it is . . . (2) capable of accurate and ready determination by resort to sources whose

accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2).  These filings, as with the court

filings in the WestPoint bankruptcy case,  are public documents that have either been filed with the

---

[19]    Amended Schedule 13-D filed on behalf of XO on 6/21/04, and on behalf of
ACEH and the debtor on 5/17/05.  Both Mr. Icahn personally and his wholly-owned Starfire are
signatories both to XO's October 3, 2005 SEC Form 4 and its June 21, 2004 Amended Schedule
13D.  Further, the "Remarks" section added to the Form 4 by the signatories notes that Mr. Icahn,
through a series of companies that includes Starfire, is the beneficial owner of XO's Preferred
Shares.

SEC or are available on court dockets, and are proper subjects for judicial notice under Federal Rule

of Evidence 201(b)(2).  See Oran v. Stafford, 226 F.3d 275, 289 (3d Cir. 2000) (admitting SEC

filings under F.R.E. 201, including Form 4s); Southmark Prime Plus, L.P. v. Falzone, 776 F. Supp.

888, 892-93 (D. Del. 1991) (same).


In a similar setting, the bankruptcy court for the Northern District of Illinois determined,

"[w]ithout hesitation", that the ongoing representation by a law firm of a substantial party-in-interest

disqualified a law firm from serving as general bankruptcy counsel for the debtor-in-possession.  In

re Envirodyne Indus., Inc., 150 B.R. at 1016.  The debtor sought to retain the law firm of Cleary,

Gottlieb, Steen and Hamiling ("Cleary, Gottlieb") as attorneys for the debtor-in-possession.  Cleary,

Gottlieb continued to represent Salomon Brothers, a substantial creditor and equity holder of the

debtor in unrelated matters.[20]  "The key issue is whether the firm's interest in maintaining the client

relationship with Salomon, a substantial party-in-interest, could impair the firm's ability to act with

impartiality, even unconscious impartiality."  Id. at 1019.  Thus,

> The court must remain cognizant of the fact that Salomon is an insider, a 64% owner,
> and a substantial creditor of the Debtor Envirodyne.  The negotiation of a plan of
> reorganization likely will necessitate negotiation with Salomon, a "substantial client"
> of Cleary, Gottlieb.  Given these facts in this case, the Debtors' interests and the
> interests of the creditor body as a whole are not best represented at a negotiation table
> by a lawyer who faces a substantial client on the other side.

---

[20]      In Envirodyne, Clealy, Gottlieb not only continued to represent Solomon Brothers
in unrelated matters, but had also represented the creditor in the earlier leveraged buy-out of the
debtor, a transaction which was vulnerable to investigation during the debtor's Chapter 11
reorganization.  Here, Sonnenschein was not involved in the pre-petition matters pertaining to the
debtor, including the Exchange Transaction which may be investigated.  Nevertheless, the
Envirodyne court is instructive here for its focus on the conflict between the representation of the
debtor and the concurrent representation of a party-in-interest in unrelated matters.

Id.

Here, the parallels with <u>Envirodyne</u> are significant.  Icahn and his affiliates are substantial parties-in-interest in the debtor's Chapter 11 case.  Although Sonnenschein quantifies the extent of the representation of Icahn Affiliates as constituting only "approximately 1% of Sonnenschein's annual revenue",[21] the attorney who leads the Sonnenschein team in representing the debtor, Peter D. Wolfson, Esquire, acknowledged at the November 10 hearing that he is the lead counsel on all Icahn Affiliate referrals for the firm, and is the "contact person" on these engagements.[22]  While I fully accept Mr. Wolfson's intention to "take [the firm's] role very seriously, . . . [and to] approach each situation in a very professional manner,"[23] the prospect that the firm would have incentive not to "'bite the hand that feeds it'", <u>Envirodyne</u>, 150 B.R. 1018 (quoting <u>In re Amdura</u>, 121 B.R. 862, 867 (Bank. D. Colo. 1990)) is evident.[24]

The Tenth Circuit, quoting the bankruptcy court for the Central District of California, articulated the principle well:

> The reasons why counsel to a debtor in possession must meet the high standards of undivided loyalty established in § 327(a) are explained in <u>In re McKinney Ranch</u>

---

[21]     Wolfson Decl. at 7, ¶17.

[22]     T78-20 (11/10/05).

[23]     <u>Id</u>. at T80-12 through 13.

[24]     By these comments, I do not mean that the representation of a referral source by a professional retained under section 327(a) necessarily serves as a disqualifier.  Each circumstance must be examined to determine whether an adverse interest is represented.

Assoc., 62 B.R. 249 (Bankr.C.D.Cal. 1986).

> It is the duty of counsel for the debtor in possession to survey
> the landscape in search of property of the estate, defenses to claims,
> preferential transfers, fraudulent conveyances and other causes of
> action that may yield a recovery to the estate.   The jaundiced eye and
> scowling mien that counsel for the debtor is required to cast upon
> everyone in sight will likely not fall upon the party with whom he has a
> potential conflict . . . .

Id. at 254.

> The policy behind disqualification for representing potentially
> conflicting interests provides the key to its extent.   The jaundiced eye
> and scowling mien of counsel for the debtor should fall upon all who
> have done business with the debtor recently enough to be potential
> targets for the recovery of assets of the estate.   The representation of
> any such party disqualifies counsel from representing a debtor.   Any
> more remote potential conflict should not result in disqualification.

Id. at 255.

In re Interwest Business Equip., Inc., 23 F.3d 311, 316 (10th Cir. 1994).   "The jaundiced eye and

scowling mien that counsel for the trustee should be casting on all who have recently done business

with each corporation will likely not fall on counsel's other clients."   Id. at 317.

The fact that Icahn and AREH are represented in this case by separate counsel, Brown

Rudnick, does not insulate Sonnenschein from disqualification under section 327(a).  Nor does the

fact that the Committee, rather than the debtor's general bankruptcy counsel, would most likely

represent the bankruptcy estate in a fraudulent transfer action challenging the Exchange Transaction

serve to alleviate Sonnenschein's positional conflict.  The ongoing representation of Icahn Affiliates

West Point and XO unavoidably aligns Sonnenschein with the Icahn Affiliates that are directly

adverse to the debtor, and will preclude Sonnenschein from casting "the jaundiced eye and scowling mien" on its own clients, as it would be required to do.

In summary then, by its representation of portions of the Icahn enterprise, Sonnenschein represents "a competing economic interest tending to diminish estate values or to create a potential or actual dispute in which the estate is a rival claimant," In re First Jersey Sec. Inc., 180 F.3d 504, 509 (3d Cir. 1999), and is therefore disqualified from retention under section 327(a).

II.    Libra Retention Application

Prior to the filing of the debtor's bankruptcy case, Libra was retained by the debtor and by other Icahn Affiliates related to the debtor in various capacities. In December 2002, Libra was retained by the Audit Committee of API, the general partner of AREP.[25] The retention involved the "proposed acquisition by AREP of certain debt and equity interests" of the debtor.[26] Libra received a $50,000 retainer, but asserts that it did not engage in any "significant substantive efforts", and terminated the engagement when informed that AREP decided not to go forward with the planned acquisition.[27]

---

[25]    Gregory Bousquette Suppl. Aff. at 2, ¶ 4.

[26]    Id.

[27]    Id. See also Andrew K. Glenn Decl, Exh. B (Bousquette Deposition) at 10-7 to 11-6 and 58-22 to 59-25 (11/4/05).

As noted above, Libra was retained in the spring of 2003 by an Independent Committee of the

debtor's Board of Directors in connection with the Exchange Offer.  Libra issued a fairness opinion

dated July 14, 2003, that the Exchange Offer was fair "from a financial point of view" to the debtor's

shareholders, and a TIA Certificate opining that the "release of all of the collateral from the lien of

the security documents . . . will not impair the security under the Indenture."  Later in 2003, Libra

continued its work on the Exchange Transaction by assisting KPMG, the debtor's outside auditor, to

value the warrants that were to be distributed to the debtor's shareholders, and to value the ACEH

Notes to be issued.[28]   In further consummation of the Exchange Transaction, ACEH retained Libra

in November 2004 to value the warrants to buy ACEH stock.[29]

More recently, Libra was retained by the Independent Committee of the debtor's Board of

Directors, in July 2005, to identify ways to satisfy the outstanding Notes, by sale, refinance or

otherwise.

Based on the pre-petition employment of Libra by the debtor and by the Icahn Affiliates, I

conclude that Libra may not be retained as a professional under Section 327(a) on several grounds.

---

[28]     Bousquette Suppl. Aff. at 3, ¶ 7.  See also Andrew K. Glenn Decl., Exh. B at 49-1
to 50-17.  Libra contends that the "sole and exclusive purpose for this additional valuation work
was to record the values on the financial statements and not as something that was a decision-
making mechanism for any aspect of the exchange offer."  Id. at 50-5 to 50-9.

[29]     Bousquette Suppl. Aff. at 3-4, ¶ 8.  See also Andrew K. Glenn Decl. Exh. B at 54-
7 to 54-22 and 111-8 to 112-1.

A.      Libra is Not "Disinterested" Under Section 101(14)(B) and (C)

Libra does not qualify as a "disinterested person" under section 327(a), because Libra served

the debtor as its "investment banker" for the debtor's security.  Under the applicable definition of

"disinterested person",[30] a disinterested person "is not and was not an investment banker for any

outstanding security of the debtor," 11 U.S.C. § 101(14)(B) and "has not been, within three years of

the filing of the petition, an investment banker for a security of the debtor."  11 U.S.C. § 101(14)(C).

In this instance, the Notes qualify as securities of the debtor.  The Code defines a "security"

to include notes, bonds, debentures, and "collateral trust certificate[s]."  11 U.S.C. § 101(49).

Following the Exchange Transaction, the debtor became the sole obligor on the Notes.

The term "investment banker" is not defined under the Code.  One court has noted that "[a]n

investment banker is traditionally an underwriter of new issues of securities, which acts as an

intermediary between the issuing corporation and the public."  In re Glosser Bros., Inc., 102 B.R. 38,

41 (Bankr. W.D. Pa. 1989).  But the language of the statute is not limited to underwriting new issues

of securities.  Some of Libra's pre-petition activities may not constitute "investment banking for a

security of the debtor."  For example, Libra's attempts to market ACEH stock owned by the debtor

do not involve the debtor's own securities.  Rather, such activities involve ACEH stock.  Arguably,

---

[30]      As noted above, section 101(14) has been amended, effective October 17, 2005, to
delete references to investment bankers.  See supra note 7.

Libra's valuation of warrants in 2003 for the debtor (and in 2004 for ACEH), do not constitute

"investment banking for a security of the debtor."  Other activities completed by Libra for the debtor,

including the issuance of a TIA Certificate in 2003 opining on the release of the liens collateralizing

the Notes, and the transfer of assets to another entity in exchange for a minority share of stock in that

entity, however, do compel the imposition of the label of "investment banker for a security of the

debtor."   The 2005 pre-petition retention of Libra contemplated the assistance and advice by Libra to

the Independent Committee "with respect to various alternatives to pay, satisfy or otherwise

refinance the $43,741,030 principal amount and accrued, but unpaid interest, of the [11%] Notes,

which may include possible sale of [the debtor's] assets, consisting of the [ACEH stock]."[31]  Libra

itself describes its function in its application as "the preeminent investment bank providing merger

and acquisition advisory services to the small cap gaming sector."[32]


In similar circumstances, the Sixth Circuit held that the applicable provisions of 11 U.S.C. §

101(14) precluded the debtor's employment of its pre-petition investment banker, Goldman, Sachs &

Co., as its financial advisor in Chapter 11.  In re Eagle-Picher Indus., Inc., 999 F.2d 969, 971-72 (6th

Cir. 1993).  Goldman Sachs, an investment banker, served as an underwriter for the debtor's

outstanding securities, and continued to serve as a remarketing agent for one of the debtor's

outstanding bond issues.  Id.  Rejecting the argument that the banker had no actual conflict with the

debtor, did not hold or represent an adverse interest, and ought to be retained because of its pre-

---

[31]      Debtor's Appl. to Retain Libra, Exh. A (Engagement Letter) at 1, at ¶ 1(a)(i).  See
also Bousquette Suppl. Aff. at 4, ¶ 10.

[32]      Bousquette Suppl. Aff. at 5, ¶ 11.

petition familiarity with the debtor's affairs, the court noted that a person can be

> not "disinterested," yet without an adverse interest.  Although it may make little sense
> to the bankruptcy court and the debtors-or, for that matter, to this court-that Goldman,
> Sachs is not permitted to serve as financial adviser, the statute requires that result.
> This court is bound to apply the plain meaning of the statute even when the
> application apparently results in an apparent anomaly.

Id. at 972.

The court also rejected the argument that section 1107(b) saved the debtor's application.

That section states that "[n]otwithstanding [Section 327(a)], a person is not disqualified for

employment under [Section 327] by a debtor in possession solely because of such person's

employment by or representation of the debtor before the commencement of the case."  11 U.S.C. §

1107(b).  The court noted that:

> The language of section 327(a), when read in conjunction with the definitions
> set out in section 101(14), does not leave room for debate:  Goldman, Sachs is and
> was an investment banker for outstanding securities of the debtors, and as such, is not
> a disinterested person within the meaning of the statute.  To read section 1107(b) as
> providing an exception in this case would be to rob sections 101(14)(B) and (C) of
> any meaning in cases with debtors-in-possession.  (footnote omitted).  As the court in
> Middleton Arms [934 F.2d 723 (6th Cir. 1991)] made clear, section 1107(b) is a
> narrow exception, meant to apply only when the sole reason for disqualification is
> former employment.  Goldman, Sachs was formerly employed as Eagle-Picher's
> investment banker-but, moreover, was the investment banker for an outstanding
> security.  This is more than "mere" employment.

Id. (emphasis in original).  See also In re Federated Dep't Stores, Inc., 44 F.3d 1310, 1318 (6th Cir.

1995) ("Where a professional is disqualified for other reasons expressly listed in the statutory

definition of an 'interested person,' § 1107(b) does not apply.").

30

In <u>Federated Department Stores</u>, the Sixth Circuit followed <u>Middleton Arms</u> and <u>Eagle-Picher</u> to reverse the bankruptcy court's order allowing the debtor's retention of a financial advisor, concluding that equitable considerations may not alter the disinterestedness requirement where the definition of disinterestedness is unambiguous.  The court "recognized certain inherent equitable powers of a bankruptcy judge, but . . . concluded that those powers 'must be exercised within the confines of the Bankruptcy Code.'" 44 F.3d at 1318 (quoting <u>Middleton Arms</u>, 934 F.2d at 724).

The Third Circuit has not addressed the "investment banker" portions of section 101(14) and, given the recent repeal of these sections, may never do so.  Nevertheless, the Third Circuit cited both <u>Middleton Arms</u> and <u>Eagle-Picher</u> in agreeing that the plain language of "disinterested" in section 101(14) and the definition of "creditor" in section 101(10)(A) "unambiguously forbid a debtor in possession from retaining a prepetition creditor to assist it in the execution of its  Title 11 duties." <u>United States Trustee v. Price Waterhouse</u>, 19 F.3d 138, 141 (3d Cir. 1994).  Quoting <u>Middleton Arms</u>, the court rejected equitable considerations where the applicable statutory language is unambiguous, stating that:

> Finally, the appellees, like the bankruptcy court and the district court, stress the practical benefits of employing [as accountant and financial advisor] Price Waterhouse in this case.  As the Sixth Circuit has aptly observed, however, "bankruptcy courts cannot use equitable principles to disregard unambiguous statutory language."  (Internal quotations and citations omitted).  If it is thought that Section 327(a) should allow trustees and debtors in possession under some circumstances to employ professionals who are not "disinterested," an amendment of that provision should be sought from Congress.

<u>Id.</u> at 142 (quoting <u>Middleton Arms</u>, 934 F.2d at 725).  <u>See also</u> <u>In re Essential Therapeutics, Inc.</u>, 295 B.R. 203, 207 (Bankr. D. Del. 2003).

31

In section 101(14)(B) and (C), Congress unambiguously designated an investment banker for a security of the debtor as not "disinterested."  Because I conclude that Libra was an investment banker for a security of the debtor within the last three years, I conclude that Libra does not qualify for employment by the debtor under section 327(a).

B.      Libra Holds an Interest Materially Adverse to the Bankruptcy Estate

In the alternative, Libra is disqualified from retention under section 327(a) because Libra's various supporting roles in the Exchange Transaction place Libra in a materially adverse position to the bankruptcy estate.  Libra issued a fairness opinion stating that the Exchange Offer was fair to the debtor's shareholders, issued a TIA certificate noting that the debtor's bondholders would not be impaired by the transaction, and participated in two valuations of the warrants issued pursuant to the Exchange Transaction, one for the debtor and one for ACEH. The remaining bondholders and minority shareholders of the debtor allege that by the Exchange Transaction, the Icahn Affiliates stripped the Notes of their liens and covenants, rendering the debtor's bondholders into unsecured creditors and diminishing thereby the value of their interests.  They allege further that the transaction wrongfully rendered the debtor a minority shareholder of the entities who now own the assets, with the shares of stock in those entities its only remaining asset.  By the positions taken by the bondholders and minority shareholders in this case, the Exchange Transaction is a likely target for fraudulent transfer litigation, as are the parties that were connected to the transaction.

Given the fact that the bondholders represent the primary economic interest in the case at

this point,[33] their announced intention to undo the Exchange Transaction, and to seek redress for

damages incurred from participating parties, place them in direct and actual conflict with Libra,

requiring the disqualification of Libra under section 327(a).  In re Marvel, supra, 140. F.3d at

476.  Even if the threat of litigation against Libra for its role in the Exchange Transaction

constitutes only a potential conflict of interest, the circumstances presented compel the

disqualification of Libra.  At the heart of this case is the manner in which the bondholders will be

paid, i.e., by the sale of the debtor's shares of AREH stock, by litigation against the Icahn

Affiliates and others connected with the Exchange Transaction, or both.



_____To be retained under section 327(a), Libra must be a "disinterested person" under section

101(14).  Libra is not disinterested, because it has an interest materially adverse to the interests of

the estate, and the interests of the bondholders, in violation of section 101(14)(E).



III.    Katten's Retention Application



Finally, the debtor proposes to employ Katten as its special corporate counsel, under

section 327(e), to represent the debtor "in connection with the sale of any or all of its assets and

---

[33]    As to assets, the only indication of the value of the debtor's stocks in ACEH, its
only asset (besides any avoidance actions) is the price bidders are willing to pay (approximately
$21 million offered at the November 10, 2005 hearing).  As to liabilities, after administrative
expenses and the payment of AREP's secured claim of $2.5 million, the remainder would be
applied to satisfy the bondholders' claims of approximately $47 million.

any related transactions in connection therewith."[34]  In addition to rendering legal advice with respect to the potential sale by the debtor of its assets, Katten would be retained to "render general corporate and related legal services to the Debtor as needed throughout its Chapter 11 case"[35], including the following:

> (vi)    to give legal advice and perform legal services with respect to general corporate matters and advice and representation with respect to obligations of the Debtor, its Board of Directors and officers;

> (vii)   to give legal advice and perform legal services with respect to matters involving the negotiation of the terms of and the issuance of corporate securities, matters related to corporate governance and the interpretation, application or amendment of the Debtor's corporate documents, including its Certificates of Incorporation, by-laws and material contracts, and matters involving stockholders and the Debtor's legal duties toward them; and

> (viii)  to give such other legal advise as may be necessary in connection with any of the foregoing.[36]

The firm disclosed various past representations of the debtor's creditors, all in matters unrelated to the debtor, including the representation of an affiliate of Harbert, Triage, the Royal Bank of Canada and certain of its affiliates, as well as the Indenture Trustee Wells Fargo.  The firm continues to represent Wells Fargo and the affiliates of the Royal Bank of Canada in matters unrelated to the debtor.

---

[34]    Debtor's Appl. to Retain Katten at 2, ¶ 5.

[35]    Id. at 5, ¶ 11.

[36]    Id. at 6.

34

Katten had extensive professional involvement in the Exchange Transaction.  The firm
was hired in 2003 by the Independent Committee of the debtor's Board of Directors to assist with
the transaction.  Katten participated in the preparation of the solicitation to the debtor's
Noteholders to exchange their Notes for the ACEH Notes.  The firm also assisted in the
preparation of the SEC registration statements for both the ACEH Notes and the ACEH common
stock, as well as the warrants exercisable for ACEH common stock.  Finally, Katten represented
ACEH "in connection with the negotiation and consummation of a [$10 million] senior credit
facility with Fortress Credit Corp. [("Fortress")]" as well as in "other corporate activity."  The
firm was hired to assist in the Exchange Transaction by Michael Ashner, a member of the
debtor's 2003 Independent Committee and a "valued client" of the Katten firm, past and present,
in unrelated matters.[37]  Mr. Ashner resigned from his position on the debtor's Board of Directors
on May 31, 2005.  One week before the petition was filed, he received a payment of $5,625 from
the debtor on account of fees due to him as a Board member.

_____Under section 327(e), a debtor-in-possession may employ, for special purposes, "an
attorney that has represented the debtor, if in the best interest of the estate, and if such attorney
does not represent or hold any interest adverse to the debtor or to the estate with respect to the

---

[37]      Katten's representation of Mr. Ashner was not disclosed in the retention
application, but was disclosed in the course of the deposition testimony of Joel A. Yunis, a
partner of the Katten firm.  Glenn Decl., Exh. H (Joel A. Yunis Deposition) at 15-2 through 15-
22.

matter on which such attorney is to be employed." 11 U.S.C. § 327(e).[38]  The debtor argues that

Katten's limited retention, for the purpose of facilitating the sale of debtor's ACEH stock

through Libra, would be in the "best interests" of the estate given that Katten is "intimately

familiar with the Debtor's corporate history, organization, finances, regulatory environment and

contracts," resulting in significant cost-savings to the estate.[39]  While the debtor is certainly

correct that the retention of new counsel who is unfamiliar with the debtor and its history might

occasion increased expense to the estate, see, e.g., In re DeVlieg, Inc., 174 B.R. 497, 502 (N.D.

Ill. 1994), appeal dismissed, 56 F.3d 32 (7th Cir. 1995) ("Any new attorney employed at this point

in these matters would, of necessity, be required to duplicate a great deal of [the subject firm's]

efforts, at substantial expense to the estate"), the debtor's pragmatic concern cannot overcome

the fundamental problems with Katten's retention.[40]

Katten personally holds a interest that is adverse to the estate because, like Libra, Katten

is potentially a named defendant in the litigation proposed by the Committee, to undo the

Exchange Transaction and to seek redress from participating parties.  Such a suit would place

---

[38]      In light of the expansive purposes of the Katten retention proposed by the debtor, including the rendering of general corporate and related legal services, it may be argued that the retention should be considered under section 327(a).  Because the retention may not be approved under the less restrictive provision of section 327(e), we need not determine the applicability of section 327(a).  See, e.g., In re Congoleum, Corp., 426 F.3d 675, 692 (3d Cir. 2005) (law firm's retention was "far too expansive an assignment to be appropriate for an appointment under §327(e)").

[39]      Debtor's Reply Br. in Support of Appl. to Retain Professionals at 25.

[40]      Concerns expressed by the U.S. Trustee in its objection to Katten's retention regarding possible preference payments to Katten have been resolved.

36

Katten in direct and actual conflict with the estate.  As with Libra, even if the threat of litigation

against Katten for its role in the Exchange Transaction constitutes only a potential conflict of

interest, my discretion must be exercised to compel Katten's disqualification.  As originally

presented, the sale process advanced by the debtor on the first day of this Chapter 11 case

proposed that the debtor's ACEH stock "be transferred to the ultimate purchaser free and clear of

all liens, encumbrances, and other interests pursuant to section 363(f) of the Bankruptcy Code."[41]

As the Ad Hoc Committee correctly reflects, the proposed sale process would be employed to

"cleanse" the debtor's ACEH stock of fraudulent conveyance liability, and Katten "may be put in

the position of defending advice it already gave and advising the Debtor to consummate a sale

that could potentially defeat the estate's causes of action arising from the Exchange Offer."[42]


The debtor argues that the Exchange Transaction cannot and should not be challenged

because at this point, particularly because ACEH now has a $10 million revolving credit facility

with Fortress, "an unrelated third party lender, pursuant to which Fortress has a first tier lien on

the assets of [ACEH] and ACE.  If the [Exchange] [T]ransaction is unwound, it is unclear

whether the Fortress liens or the liens of the 11% Noteholders would be superior because after

unwinding the transactions they would be secured by the same assets."[43]  In this regard, it must

be recalled that Katten served not only as counsel to the Special Committee of the debtor's Board

---

[41]    Debtor's Motion to Sell ACEH Stock at 19, ¶47.

[42]    Obj. of Ad Hoc Committee in Opp. to Retention Apps. and Proposed Sale Process
at 9.

[43]    Debtor's Reply Brief in Support of Retention Appl. at 6.

of Directors in connection with the Exchange Transaction, but also served as counsel for ACEH

in connection with the transaction.  Moreover, Katten provided legal services to ACEH in

securing the Fortress financing.[44]  In these circumstances, it would appear that Katten's main

loyalty would have to be to itself, i.e., to avoid liability as the transactions the firm did so much

to facilitate become the focus of attention.  Katten's participation in the proposed sale of the

debtor's ACEH stock constitutes an adverse interest to the estate "with respect to the matter on

which such attorney is to be employed."  11 U.S.C. §327(e).  Therefore, Katten may not be

retained as debtor's special counsel.


**CONCLUSION**


For the reasons expressed, I conclude that the retention applications of Sonnenschein,

Libra and Katten must be denied.  The Committee's counsel is requested to submit orders in

conformance with this opinion.


Dated:   December 6, 2005                          JUDITH H. WIZMUR
                                                  Chief U.S. Bankruptcy Judg

---

[44]  Fortress is apparently also one of the prospective buyers for the debtor's ACEH stock.
Debtor's Appl. to Retain Katten, Decl. of Joel A. Yunis at 3.